**THE SEHAT LAW FIRM, P.L.C.**
Cameron Sehat, Esq.
18881 Von Karman Ave., Suite 850
Irvine, California 92612
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
Email: Cameron@sehatlaw.com

Attorney for Plaintiffs, PATRICK RUSSELL, as Personal Representative of the
Estate of Patrick John Russell and individually; LYNNE RUSSELL, as Personal
Representative of the Estate of Patrick John Russell and individually

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK RUSSELL, as Personal Representative of the Estate of Patrick John Russell and individually; LYNNE RUSSELL, as Personal Representative of the Estate of Patrick John Russell and individually, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF ORANGE; ORANGE COUNTY SHERIFF-CORONER SANDRA HUTCHENS, individually and in her official capacity; JOSELYN LUMITAP, individually; PATTI TROUT, individually; MARIA TEOFILO, individually; THOMAS LE, individually; and DOES 1 through 10, inclusive, <br><br> Defendants. | ) Case No.: 17-CV-00125-JLS (DFM) <br> ) Hon. Judge Josephine L. Staton <br> ) <br> ) **PLAINTIFFS' DAUBERT** <br> ) **MOTION #1 TO EXCLUDE THE** <br> ) **OPINION TESTIMONY OF** <br> ) **ALFRED JOSHUA** <br> ) <br> ) <br> ) **Hearing:** <br> ) Date:       June 8, 2018 <br> ) Time:       1:30 PM <br> ) Courtroom: 10A <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) ` |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 8, 2018 at 1:30 PM, or as soon thereafter as the matter can be heard, in Courtroom 10A of the above entitled court located at 411 W. Fourth St., Santa Ana, California, 92701, Plaintiffs PATRICK AND LYNNE RUSSELL ("Plaintiffs") will move this court to exclude the opinion testimony of Defendants' expert witness, Dr. Alfred Joshua.

Plaintiffs will move for an Order, pursuant to Federal Rules of Evidence 702, precluding the testimony of Defendant County of Orange's ("County") expert witness Dr. Alfred Joshua in its entirety.

## INTRODUCTION

County served a report from Dr. Alfred Joshua, Defendants' correctional healthcare expert, on January 9, 2018 to Plaintiffs. A copy of his report and rebuttal, served on February 6, 2018, are attached as Exhibits "A" and "B", respectively. As the report makes clear, Dr. Joshua's fields of expertise are not in cardiology, interventional cardiology, surgery, or treatment of heart conditions. Defendants intend to offer into evidence opinion testimony by Dr. Joshua regarding such things as the underlying medical condition causing Patrick's chest pain, mortality rates involved with an aortic dissection, the likelihood of survival after doctors perform a surgical repair, as well as any testimony that is theoretical and conjectural in nature. These opinions are highly speculative and not founded on any factual basis in answering the question of if Defendants showed deliberate indifference in the manner in which they provided care to Patrick Russell. Dr. Joshua seeks to proffer testimony regarding the mortality rates of persons who are faced with similar cardiac events as Mr. Russell's, the likelihood of missing such a diagnosis by medical staff, and registered nursing policy and procedures for

"Angina Pectoris" that he deemed to be inapplicable. Dr. Joshua has no expertise and no basis on which to opine as to the issues just identified.

## DR. JOSHUA'S OPINION IS EXCEEDING THE SCOPE OF HIS EXPERTISE AND IS BARRED FROM COMING IN AT TRIAL UNDER FED. R. EVID. 702, 703, 704, and 705

"Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591-92 (1993). Trial courts must conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. *Daubert's* gate keeping obligation applies to all expert testimony, not just "scientific" testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Under Rule 702, an expert witness may testify in the form of an opinion if, inter alia, "the testimony is based on sufficient facts and data" and is "the product of reliable principles and methods." Supplementally, under *Luce v. United States* (1984), a court may instruct opposing counsel to avoid any mention of the precluded evidence in question during trial, or in argument to the jury. (citation omitted).

Dr. Joshua is attempting to offer speculation testimony regarding the mortality rate of those suffering from an aortic dissection, such as the one Mr. Russell was suffering from. He states that "those who experience an aortic dissection have a mortality rate of 20%." *See* Exhibit "B" at pg. 4 ¶ 3. He also states that the "overall in-hospital mortality rate for aortic dissection is 27.4%." See Exhibit "A" at pg. 6 ¶ 2. This is highly speculative and in proffering such information, Dr. Joshua would be insinuating to jurors that even had Mr. Russell been seen at the Emergency Department and treated by their physician, there was a reasonable chance that he still would have died. He also says that it is very easy that Mr. Russell's dire condition could have missed by an ER physician at that

time. *See* Exhibit "B" at pg. 4 ¶ 2. Dr. Joshua cannot opine to such speculative opinions. Lastly, Dr. Joshua writes in his report that it is not uncommon for emergency rooms to wait 10-12 hours before performing surgery. However, again, Dr. Joshua lacks the knowledge of what would have happened at that time to form such opinions. It is important that opinions such as these are kept out because when proffered by the expert, these opinions carry great weight to the jurors and having such inflammatory testimony be entered in would greatly prejudice and harm Plaintiffs' case.

Under Federal Rules of Evidence, Rule 702, governing expert testimony at trial, experts' opinions have to be based upon four elements:

1. The expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

2. The testimony is based on sufficient facts or data;

3. The testimony is the product of reliable principles and methods; and

4. The expert has reliably applied the principles and methods to the facts of the case.

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. Fed.R.Evid. 703. Dr. Joshua fails to use sufficient facts and lacks the proper training to formulate such opinions regarding deliberate indifference within the jail setting. The facts and data Dr. Joshua is relying on have not been entered into evidence and are highly speculative opinions formed by Dr. Joshua as a means of exonerating Defendants from liability by saying there was a fair chance that Mr. Russell would have died no matter what action was taken on the days leading up to his death. Plaintiffs find that allowing such testimony would be prejudicial and highly inflammatory.

**DR. JOSHUA MAY NOT ATTEST TO FACTS NOT KNOWN TO HIM AT THE TIME OF THE INCIDENT**

In Dr. Joshua's report he references that Mr. Russell's death could have been caused by a spontaneous or congenital aortic dissection. Dr. Joshua does not know Mr. Russell's familial history to know if there was anything congenital about Mr. Russell's condition. Not to mention this information is speculative and irrelevant. Dr. Joshua also states that the aortic dissection could have been spontaneous, but we know this is not true based on the prolonged (14+ hours) that Mr. Russell was suffering from chest pain. There was nothing spontaneous about Mr. Russell's condition.

Plaintiffs also seek to exclude any opinions proffered by Dr. Joshua that the registered nursing policies and procedures for "Angina Pectoris" was inapplicable to Mr. Russell at the time of the incident. However, this opinion seems to be based off of postmortem findings that Mr. Russell was not suffering from Angina Pectoris, but instead was slowly dying from an aortic dissection. Both Angina Pectoris and an aortic dissection will present themselves with the same symptoms so there would have been no way for Defendants to have differentiated the two and thus should have treated Mr. Russell under the guidelines of a patient suffering from Angina Pectoris. Dr. Joshua was not present at the scene and not in the minds of the Defendants to know that Angina Pectoris was an inapplicable treatment plan for Mr. Russell and thus should not be able to testify as such because it is Plaintiffs' belief that Dr. Joshua formulated such an opinion once he learned of Mr. Russell's actual cause of death.

Plaintiffs respectfully request that such evidence be excluded from being presented at trial as it would only serve to confuse the jury as to the relevant issues. Federal Rules of Evidence Rule 402 provides that "[e]vidence which is not relevant is not admissible." While only relevant evidence is admissible, a court also has the discretion to exclude such evidence if it's probative value is "substantially outweighed by a danger of [...] unfair prejudice, confusing the

issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

The Ninth Circuit has held that "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Mukhtar v. California State Univ., Hayward,* 299 F.3d 1053, 1066 n. 10 (9th Cir.2002). Thus, while an expert witness generally may give opinion testimony that embraces an ultimate issue to be decided by the trier of fact, that expert may not express a legal opinion as to the ultimate legal issue. *Id.*; *See also* Fed.R.Evid. 704(a). The determining factor in if Defendants showed deliberate indifference to Mr. Russell's serious medical needs is if they were aware of the need and failed to act upon it. By Dr. Joshua offering opinion that is irrelevant out of the scope of his expertise such as the cause of the aortic dissection (with both causes not even being feasible in Mr. Russell's case) and forming a legal opinion, it will cause great confusion for the jury and does not speak at all to finding the "state of mind" of the Defendants.

## CONCLUSION

Plaintiffs respectfully request that the Court deny the expert testimony of Dr. Joshua from being entered into trial for the foregoing reasons.

Dated:  May 9, 2018                    THE SEHAT LAW FIRM, PLC

By:*/s/ Cameron Sehat*
CAMERON SEHAT
Attorney for Plaintiffs

# PROOF OF SERVICE BY MAIL

**STATE OF CALIFORNIA** )
**COUNTY OF ORANGE** )

I am employed in the County of ORANGE, State of California, I am over the age of eighteen years and not a party to the within-entitled action: my business address is: 18881 Von Karman Ave., Ste. 850, Irvine, CA 92612. On May 9, 2018 I served the foregoing document described as:

**PLAINTIFFS' DAUBERT MOTION TO EXCLUDE THE OPINION TESTIMONY OF ALFRED JOSHUA**

<u>To all interested parties in this action as follows:</u>

**S. Frank Harrell**
**Pancy Lin**
**Chariese R. Solorio**
**LYNBERG & WATKINS**
**1100 Town & Country Road, Ste. 1450**
**Orange, California 92868**

__X__   **BY MAIL**

__X__   I caused such envelope to be deposited in the mail at Irvine, California. The envelope was mailed with postage thereon fully prepaid.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 9, 2018 at Irvine, California.

MADISON GILLIS

# EXHIBIT A

**Alfred Joshua, MD, MBA, CCHP-P, FAAEM**

**P.O. Box 5000 PMB 525 Rancho Santa Fe, CA 92067**

## I. INTRODUCTION

My name is Alfred Joshua, MD, MBA, CCHP-P, FAAEM. My business address is P.O. Box 5000 PMB 525 Rancho Santa Fe, CA 92067. I was retained by County of Orange County Counsel at the request of Attorney Pancy Lin on case Russell v. County of Orange. (Case No. 17-cv-00125 JLS (DFM)) My rate for consulting is $450 per hour and for court or deposition testimony is $500-600 per hour.

## II. BACKGROUND AND EDUCATION

I received my Doctorate of Medicine from the State University of New York, Syracuse (Upstate University), and completed my post-graduate residency training at UC San Diego Emergency Medicine Residency program in San Diego. I completed a two-year fellowship in Hospital Administration at UC San Diego under the mentorship of the CEO, CMO and President of the Medical Group. I have been a licensed Physician and Surgeon in the State of California and have maintained my board certification in Emergency Medicine (ABEM) since July 2012. I have worked in the healthcare industry as an emergency medicine physician, primary care, detoxification services, and correctional medicine and administration. Additionally, I have a Master of Business Administration (MBA) degree from the University of California, Irvine. I received a Certification for Certified Correctional Health Professional (CCHP) from National Commission of Correctional Healthcare (NCCHC). I have also received the CCHP physician specialty certification (CCHP-P) upholding the highest standards of correctional healthcare. There are only around 70 correctional physicians across the country who have received the designation as of November 2017.

### A. Professional Experience

I was selected in 2013 to lead the San Diego County Sheriff's Medical Services Division as Chief Medical Officer to design and manage a medical system that provides comprehensive medical care for the 91,000+ inmate/patients who are annually booked with a daily census of 5,800+ inmate/patients who are housed at seven detention facilities throughout the San Diego region covering 4,562 square miles. I have been designing an innovative managed care model for the county jails in order to meet the medical and financial challenges of AB 109 or Public Safety Realignment. I led the creation of a Managed Care Department for central utilization review within the Sheriff's Department and established new value based hospital contracting in inpatient and outpatient medical care over past two years. I have revised or created 50+ Departmental Medical policies to standardize medical care across seven facilities as well as revising Sheriff's department medical and psychiatric formulary to improve quality of care for patients. I have redesigned Mental Health care with a new Inmate Safety Program that is designed to reduce suicide deaths, attempts and safety cell placements. I have led the creation of a Telehealth

1

program which provides and expedites timely access to outpatient specialty care for inmates. Prior to the Sheriff's Department, I served as the Senior Medical Officer in Healthcare Reform at Tri-City Medical Center and as Medical Director for Volunteers of America, a non-profit organization that assists the homeless and those rehabilitating from drugs and alcohol. I have completed a two-year hospital administrative fellowship at UC San Diego after completion of my emergency medicine residency. I have worked clinically in the Emergency department at UC San Diego and at Tri-City Medical Center and currently practice clinically at the Veterans Affairs Emergency Department. I currently sit on the Board of Directors for San Diego Health Connect a leading national health information exchange platform located in San Diego and the Council of Mentally Ill Offenders (COMIO) and was appointed by the Speaker of the House of California in 2015.

In addition to the above, I regularly meet with other jail administrators and medical directors from several jurisdictions in Southern California to discuss emerging topics and best practices. I have served as a subject matter expert for the Medical/Mental Health Workgroup for Board of State and Community Corrections (BSCC) in 2016 to make the most recent revisions to Title 15 regulations, which govern jail correctional entities in the State of California. I also review medical records and conduct expert witness work both within my county and in other states in the correctional healthcare field.

B. Professional Memberships

I am a member of the following organizations:

- American College of Correctional Physicians (ACCP)
- American College of Healthcare Executives (ACHE)
- American Academy of Emergency Medicine (AAEM)
- American Medical Association (AMA)
- American Correctional Health Services Association (ACHSA)
- National Commission on Correctional Healthcare Association (NCCHC)

## III. PRESENTATIONS

1. Public Safety Group CAO Quarterly Presentation Panel – Mental Health in Regards to Public Safety Realignment – February 2014
2. Neighborhood House Association – Mental Health Presentation – March 2014
3. Citizens Law Enforcement Review Board Presentation – Suicide Prevention Strategies – June 2014
4. Open Minds Presentation – Mental Health in San Diego County Jails – August 2014
5. California State Sheriffs' Association – Affordable Care Act – August 2014
6. National Commission on Correctional Health Association – Viewing Correctional Healthcare as a Payor – October 2014
7. Honorary Sheriff Deputy Association- Redesigning Medical and Mental Healthcare in San Diego County Jails: A life and death challenge 2015
8. Police Chiefs Presentation: Redesigning Medical and Mental Healthcare: 5 Year Plan
9. San Diego Mental Health Coalition: Mental Health care in San Diego Jails – April 2015

2

10. Citizens Law Enforcement Review Board Presentation – Suicide Prevention Strategies – July 2015
11. Behavioral Health Advisory Board- Nov 2015
12. San Diego Law Society- Redesigning Mental Health Care in Jails Nov 2015
13. National Commission on Correctional Health Association – Inmate Safety Program – April 2016
14. Grand Jury Presentation- Mental Health San Diego Jails July 2016
15. California Coalition for Mental Health - Correctional Mental Health Care September 2016
16. San Diego Organization of Healthcare Leaders (SOHL) Correctional Healthcare and Information Technology: San Diego County Jails and San Diego Health Connect October 2016
17. American Correctional Health Services Association - Inmate Safety Program- San Diego Jails October 2016
18. Mental Health Services OAC: Jail Mental Health Services (Panel Discussion)- March 2017
19. Past Grand Jury Association- June 2017: Overview of Jail Medical and Mental Health Services
20. California Crisis Intervention Training Association (CCITA): Redesigning Medical and Mental Health Services in Jails August 2017

## IV. PUBLICATIONS

1. Joshua A, Chan T., Castillo E.; A Tool for Emergency Department Throughput: Using Maximum ED Bed Time to Reduce Wait Times and the Number of Left Without Being Seen Patients Annals of Emergency Medicine 9/2010 (Abstract)
2. Nordt SP, Minns A, Carstairs S, Kreshak A, Campbell C, Tomaszewski C, Hayden SH, Clark RF, Joshua A, Ly BT:  Mass sociogenic illness initially reported as carbon monoxide poisoning.  J Emerg Med 2012;42(2):159-161.
3. Campbell, Joshua, Medak, et al. Is ultrasound-guided subclavian vein cannulation more successful than traditional methods? Academic Emergency Medicine. 2011; Blackwell Publishing Ltd. Vol 18(5) S211..(abstract)
4. Karla DW, Bovet J, Haynes B, Joshua A, et al. Training law enforcement to respond to opioid overdose with naloxone: Impact on knowledge, attitudes, and interactions with community members, *Drug and Alcohol Dependence* 2016
5. Degner N, Joshua A, et al. Comparison of Digital Chest Radiography to Purified Protein Derivative for Screening of Tuberculosis in Newly Admitted Inmates. Journal of Correctional Healthcare 2016 Vol. 22(4) 322-330

## Book Chapters:

1. Joshua A.  Blunt neck trauma.  In: Rosen and Barkin's 5-Minute Emergency Medicine Consult (fourth edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Barkin A, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2010.
2. Joshua A.  Subarachnoid hemorrhage.  In: Rosen and Barkin's 5-Minute Emergency Medicine Consult (fourth edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Barkin A, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2010

3

3. Joshua A:  Abdominal Imaging, Trauma.  In: Rosen and Barkin's 5-Minute Emergency. Medicine Consult (fourth edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Barkin A, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2013

## V. CASES (Involving Deposition or Trial Testimony)

1. Brummett v. County of San Diego (Deposition and Trial testimony) November 2014 (CASE NO. 12-CV-1428-BAS (BGS)

2. Torbert vs County of San Diego (Trial Testimony)- December 2015 (CASE NO. 11-CV-2953-DMS (WMC)*

3. The Estate of Ruben Nunez vs. County of San Diego (Deposition)- May 2017 (CASE NO. 16-CV-1412-BEN (MDD)

4. Williams v. Gore (Trial Testimony)- June 2017 (CASE NO. 15-CV-0654-AJB(PCL)

5. Howze v. USA, U.S. District Court for the Eastern District of Arkansas (Deposition)- June 2017 (Case No. 2:16-CV-0003)*

6. Jones v. Gardiner (Trial Testimony)- October 2017 (CASE NO. 14-CV-2477-MMA(MDD))

*Expert witness designation

## VI. MATERIALS REVIEWED

In preparation for forming the opinions expressed below, in addition to my experience in the correctional healthcare field, I have reviewed the following materials:

1. Complaint (22 pages)
2. Autopsy (8 pages)
3. Orange County Jail Medical Records (86 pages)
4. Arrest Log (6 pages)
5. Deposition of Maria Teofilo (108 pages)
6. Investigative Report (350 pages)
7. Deposition of Patricia Trout (168 pages)
8. Deposition of Jocelyn Lumitap (135 pages)
9. Deposition of Dr. Scott Luzi (68 pages)
10. Policies and Procedures (Intake, Angina Pectoris) (25 pages)
11. Kaiser Permanente Health Records (346 pages)
12. Deposition of Dr. Thomas Le (84 pages)
13. Deposition of Patrick Russell (198 pages)
14. Deposition of Lynne Russell (195 pages)

4

## VII. SUMMARY OF DOCUMENT REVIEW

January 8, 2016: Booked into Orange County Jail for Probation Violation. Receiving screening done by Denver Cua. Chest x-ray shows no acute disease. Cleared to go to housing.

January 22, 2016: Transferred to James Musick Facility (JMC) and complaining of chest pain.

January 23, 2016 (10:35PM): Seen by Registered Nurse Maria Teofilo for nausea, vomiting x 2 hours. Vital signs BP=130/86, T-96.6, P-57, RR-26, O2 sat-100%; Given Bismuth.

January 24, 2016 (12:35AM) Nitroglycerin administered by Registered Nurse and Dr. Thomas Le notified around 1AM and told to give Motrin after nursing assessment showed chest pain which was reproducible and referral to Mental Health.

January 24, 2016 (1:08AM) Seen by Nurse Patti Trout; transferred to IRC for evaluation of chest pain;

January 24, 2016 (5:32AM): Seen by Registered Nurse Maria Teofilo for chest pain. Vital signs BP-142/98, T-97, P-101, O2 sat-100%; +pain with chest palpation, lungs clear to auscultation.

January 24, 2016 (7:00AM) nl vitals

January 24, 2016 (11:08AM) Mr. Russell complains of chest pain to Registered Nurse Jocelyn Lumitap and witnessed episode of emesis. Vital signs: T-97.2, BP-139/92, O2 sat-99% RR-18

January 24, 2016 (11:40AM) Nursing assessment done by Jocelyn Lumitap Vitals on intake BP=135/96, P-105, T-98°F; Referred to mental health for history of anxiety. Reported history of hypertension one year ago and not on meds discovered when he had hand surgery at Kaiser Hospital. Patient states 10/10 "throbbing" chest pain with taking deep breaths, nausea and vomiting and did 30 pushups the other day; Mental health screening done by Cheryl Sierra and states feeling anxious about 6-9 month prison sentence and uses drugs including marijuana daily, alcohol with last drink 3 months ago.

January 24, 2016 (12:20PM): Mr. Russell collapses and paramedics called. CPR started. Patient sent to Hoag Emergency department and pronounced by Dr. James Shen.

## VIII. OPINION

Based on my review of the documents provided, and my education and training, as well as administrative and clinical experience in both the correctional health care and hospital setting, it is my opinion that Orange County Jail and its providers met the standard of care. There is no evidence to suggest deliberate indifference by the medical providers at the Orange County jail and there is ample evidence that he was seen and assessed for his symptoms of chest pain. Unfortunately, Mr. Russell suffered from a rare condition, spontaneous aortic dissection which presents, even rarer in younger patients such as Mr. Russell. In younger patients, 40-50% of the time, there are congenital factors such as Marfan syndrome which can weaken the blood vessels such as the aorta to predispose for conditions such as aortic dissection. In older patients, hypertension and atherosclerosis are the primary causes of spontaneous aortic dissection. Based on Mr. Patrick and Lynne Russell's depositions, he did not suffer from any known cardiac condition. In the depositions, Mr. Russell's parents state he was very healthy, played sports, and had no known cardiac conditions. In addition previous preoperative workups prior to surgery done at a Kaiser hospital did not reveal this condition. Mr. Russell was seen at Kaiser for a right 4th metacarpal fracture which was repaired by an orthopedic surgeon on September 3, 2014. He underwent general and local anesthesia which requires a cardiac assessment. No history of cardiac abnormalities was noted at that time. Kaiser Permanente providers also did not prescribe Mr. Russell any blood pressure medications nor diagnosis him with

5

hypertension. He was seen for mood disorder evaluation and diagnosed on November 19, 2014 with anxiety, depression and polysubstance abuse (marijuana, alcohol, pain medications, stimulants, and benzodiazepines). The only reported past medical history included self-reported hypertension and the physical exam of the registered nurse displayed reproducible chest pain. Thus the jail nursing staff assessed Mr. Russell and made a clinical assessment and relayed these findings to Dr. Thomas Le who felt his condition was more attributed to musculoskeletal or anxiety that was more likely in a 30 year old male with history of elevated blood pressure, anxiety, and recent history of doing pushups. Thus based on his past medical history he did not have known high risk conditions that are associated with aortic dissection.

Aortic dissection is a rare diagnosis and typically affects older individuals with long standing history of hypertension or atherosclerosis. The incidence of acute aortic dissection in the general population is estimated to range from 3.5 per 100,000 persons.[1] When any patient presents with symptoms, the clinical provider takes into account the patient's available history, risk factors, current symptoms, vital signs, and physical exam. This information is used to determine an assessment (by a registered nurse) and diagnosis (by a physician or midlevel providers). In Mr. Russell's case, the nursing staff did assess Mr. Russell for his symptoms and asked further questions, took vitals, and physical exam to determine their assessment. Based on a 30 year old male with past medical history of anxiety and hypertension as well as recent physical strain of push-ups, the likely assessment of many health staff would be that the origin of symptoms are caused by anxiety or musculoskeletal system. While this assessment was wrong in Mr. Russell's case, he was not denied access to medical services and in fact, the nursing staff did a complete assessment. Upon complaints of chest pain, he was transferred to the IRC and was referred to a physician. This clearly shows his symptoms were not ignored but elevated to a higher authority based on a systematic process. In patients who are diagnosed with aortic dissection in the ER, prompt referral to a cardiothoracic surgeon for aortic stent placement can be lifesaving. This procedure however has many risks including death. The overall in-hospital mortality rate for aortic dissection is 27.4%.[2] However, even if Mr. Russell had gone to the Emergency department, aortic dissection is not a routine diagnosis. Many times, Emergency department physicians miss initial complaints of chest pain in individuals with aortic dissection. In Mr. Russell's case, they would have to order a CT scan of his chest to make the diagnosis or see finding on a chest x-ray to warrant a CT scan of the chest. This procedure is not without risk due to radiation exposure, so routine CT scan of the chest in a 30 year old arriving in an Emergency department is not a given.

While hindsight is 20/20, there is no evidence of deliberate indifference by the nursing or physician staff. The complaint also references training for heart failure. Mr. Russell did not suffer from heart failure. Heart failure is when the heart muscle is weakened to the point where it cannot pump sufficiently and blood flows back into the lungs causing shortness of breath(pulmonary edema) and dependent areas such as the lower extremities (pedal edema). It is typically a chronic condition caused in patients with long standing (decades) high blood pressure or myocardial infarctions ("heart attacks") that weaken the heart. Mr. Russell suffered an aortic dissection where the blood vessel walls are weakened and the blood tracked between the walls of the aorta and went into the lungs and around the heart causing a hemopericardium. This was noted both on the autopsy report from both the Orange County Coroner and independent autopsy done by the family.

The Orange County Jail policies and procedures are adequate related to the intake process and patients dealing with angina pectoris. However, the P&P for angina pectoris is related to patients who are at risk for acute coronary syndrome. These patients typically have plaques in coronary arteries built up over decades of having risk factors such as elevated cholesterol, diabetes, hypertension, family history, obesity, and sedentary lifestyle. The nitroglycerin administered to these patients can alleviate chest pain by providing more oxygenated blood to cardiac tissues. When cardiac tissues are deprived of oxygen, it could present as chest pain in these patients. When these types of patients have a complete blockage of their artery and suffer a heart attack, nitroglycerin does not work and these patients need to go immediately to the

Emergency department via 911. In Mr. Russell's case, he neither suffered from acute coronary syndrome (angina, unstable angina, myocardial infarction) nor did he suffer from chronic heart failure. Thus the P&P for angina pectoris that guided the nursing staff would not be applicable in this case. This distinction was explained in the deposition of Dr. Thomas Le. The registered nurse, Maria Teofilo, who did the assessment on Mr. Russell, was highly qualified. Not only did she work in the jail setting, she was also a telemetry nurse who cares for cardiac patients in the hospital. Her knowledge and experience are highlighted in the deposition.

In conclusion, the Orange County P&P's, training, and systematic approach to inmate medical complaints and symptoms meet the standard of care and neither the system nor the providers show any form of deliberate indifference towards Mr. Russell's complaint of chest pain. While his death is unfortunate, any complaint such as chest pain, have a long list of etiologies stemming from cardiac, pulmonary, gastrointestinal, musculoskeletal, nervous system, psychiatric, etc. It is the patient's previous history, vital signs, current symptoms, and physical exam that guide next courses of actions. While the diagnosis of aortic dissection for Mr. Russell was unfortunate, the providers did not ignore his symptoms or do actions to not address Mr. Russell's complaints. This was further noted in the Investigative Report by the District Attorney who came to the same conclusion related to criminal negligence and found no such cause.

My opinion in this case is based on my experience in the correctional health field and clinical arenas, and upon the documentation provided to me for review. All my opinions in this report are given with a reasonable degree of medical certainty. I reserve the right to change this opinion in the event additional documentation is provided in this matter.

Executed on January 5, 2018 in San Diego, California

Alfred Joshua, MD, MBA, CHCP, FAAEM

1. Acute aortic dissection: population-based incidence compared with degenerative aortic aneurysm rupture.Clouse WD, Hallett JW Jr, Schaff HV, Spittell PC, Rowland CM, Ilstrup DM, Melton LJ 3rd.Mayo Clin Proc. 2004;79(2):176.

2. The International Registry of Acute Aortic Dissection (IRAD): new insights into an old disease. Hagan PG, Nienaber CA, Isselbacher EM, Bruckman D, Karavite DJ, Russman PL, Evangelista A, Fattori R, Suzuki T, Oh JK, Moore AG, Malouf JF, Pape LA, Gaca C, Sechtem U, Lenferink S, Deutsch HJ, Diedrichs H, Marcos y Robles J, Llovet A, Gilon D, Das SK, Armstrong WF, Deeb GM, Eagle KA JAMA. 2000;283(7):897.

7

# EXHIBIT B

**Alfred Joshua, MD, MBA, CCHP-P, FAAEM**

**P.O. Box 5000 PMB 525 Rancho Santa Fe, CA 92067**

**REBUTTAL EXPERT REPORT**

## I. INTRODUCTION

My name is Alfred Joshua, MD, MBA, CCHP-P, FAAEM. My business address is P.O. Box 5000 PMB 525 Rancho Santa Fe, CA 92067. I was retained by County of Orange County Counsel at the request of Attorneys Chariese Solorio and Pancy Lin on case <u>Russell v. County of Orange,</u> (Case No. 17-cv-00125 JLS (DFM)) My rate for consulting is $450 per hour and for court or deposition testimony is $500-600 per hour.

I was retained by Chariese Solorio and Pancy Lin, counsel for defendants in Russell v County of Orange to review additional materials(#15) listed below in paragraph VI to offer rebuttal testimony as to Dr. Phillip E. Newman's opinions expressed in his report dated January 9, 2018 on issues within my expertise, including issues related to compliance with standard of care by medical staff at Orange County detention facilities, whether or not there was evidence that Dr. Thomas Le and Nurses Teofilo and Lumitap practiced below standard of care, and whether this resulted in Mr. Russell's death. I believe Dr. Newman's opinions on these and other issues are not accurate based on his lack of understanding of a correctional environment and that his stated conclusions are without merit and not based on evidence contained within the materials that were reviewed and considered in coming to his opinions. To the contrary, I believe the care rendered to Mr. Russell was within the standard of care expected of medical staff (including Dr. Thomas Le and Nurses Teofilo and Lumitap) providing care in a correctional institution setting, that there is ample evidence to defeat any claim of substandard clinical care and that none of the actions by the physicians and staff at Orange County detention facilities constitute causing Mr. Russell to experience an aortic dissection. Dr. Thomas Le made a clinical diagnosis and treatment decision and Nurses Teofilo and Lumitap made assessment based on all available information at the time. While Mr. Russell unfortunately suffered from a rare diagnosis of aortic dissection, the providers acted within the standard of care. All of my opinions are based on my experience, training and familiarity with established standards for medical care in a correctional setting as outlined in my report.

## II. BACKGROUND AND EDUCATION

See Dr. Alfred Joshua Expert Report Dated January 5, 2018.

## III. PRESENTATIONS

See Dr. Alfred Joshua Expert Report Dated January 5, 2018.

1

## IV. PUBLICATIONS

See Dr. Alfred Joshua Expert Report Dated January 5, 2018.

### Book Chapters:

See Dr. Alfred Joshua Expert Report Dated January 5, 2018.

### V. CASES

See Dr. Alfred Joshua Expert Report Dated January 5, 2018.

### VI. MATERIALS REVIEWED

In preparation for forming the opinions expressed below, in addition to my experience in the correctional healthcare field, I have reviewed the following materials:

1. Complaint (22 pages)
2. Autopsy (8 pages)
3. Orange County Jail Medical Records (86 pages)
4. Arrest Log (6 pages)
5. Deposition of Maria Teofilo (108 pages)
6. Investigative Report (350 pages)
7. Deposition of Patricia Trout (168 pages)
8. Deposition of Jocelyn Lumitap (135 pages)
9. Deposition of Dr. Scott Luzi (68 pages)
10. Policies and Procedures (Intake, Angina Pectoris) (25 pages)
11. Kaiser Permanente Health Records (346 pages)
12. Deposition of Dr. Thomas Le (84 pages)
13. Deposition of Patrick Russell (198 pages)
14. Deposition of Lynne Russell (195 pages)
15. Plaintiff Expert Witness Report Dr. Phillip E. Newman (15 pages)
16. National Commission on Correctional Health Care Standards, Jails 2014

## VII. SUMMARY OF DOCUMENT REVIEW

January 8, 2016: Booked into Orange County Jail for Probation Violation. Receiving screening done by Denver Cua. Chest x-ray shows no acute disease. Cleared to go to housing.

January 22, 2016: Transferred to James Musick Facility (JMC) and complaining of chest pain.

January 23, 2016 (10:35PM): Seen by Registered Nurse Maria Teofilo for nausea, vomiting x 2 hours. Vital signs BP=130/86, T-96.6, P-57, RR-26, O2 sat-100%; Given Bismuth.

January 24, 2016 (12:35AM) Nitroglycerin administered by Registered Nurse and Dr. Thomas Le notified around 1AM and told to give Motrin after nursing assessment showed chest pain which was reproducible and referral to Mental Health.

2

January 24, 2016 (1:08AM) Seen by Nurse Patti Trout; transferred to IRC for evaluation of chest pain;

January 24, 2016 (5:32AM): Seen by Registered Nurse Maria Teofilo for chest pain. Vital signs: BP-142/98, T-97, P-101, O2 sat-100%; +pain with chest palpation, lungs clear to auscultation.

January 24, 2016 (7:00AM) nl vitals

January 24, 2016 (11:08AM) Mr. Russell complains of chest pain to Registered Nurse Jocelyn Lumitap and witnessed episode of emesis. Vital signs: T-97.2, BP-139/92, O2 sat-99% RR-18

January 24, 2016 (11:40AM) Nursing assessment done by Jocelyn Lumitap Vitals on intake BP=135/96, P-105, T-98°F; Referred to mental health for history of anxiety. Reported history of hypertension one year ago and not on meds discovered when he had hand surgery at Kaiser Hospital. Patient states 10/10 "throbbing" chest pain with taking deep breaths, nausea and vomiting and did 30 pushups the other day; Mental health screening done by Cheryl Sierra and states feeling anxious about 6-9 month prison sentence and uses drugs including marijuana daily, alcohol with last drink 3 months ago.

January 24, 2016 (12:20PM): Mr. Russell collapses and paramedics called. CPR started. Patient sent to Hoag Emergency department and pronounced by Dr. James Shen.

## VIII. REBUTTAL OPINIONS

The following rebuttal opinions are based on the report of Dr. Phillip E. Newman dated January 9, 2018 and his opinions are expressed in quotation marks.

1. "The care provided Mr. Russell by the medical personnel at the Orange County Jail on January 23 and 24, 2016 was below the accepted standard of care."

   The care provided by the medical personnel at the Orange County Jail was within the standard of care for correctional facilities. Dr. Newman's has very impressive credentials as a Cardiologist but his rationale for medical personnel going below the standard of care rests solely on an adult individual who complains of chest pain in any setting to be seen immediately by a physician (come to the jail and do face to face encounter) or by another physician (send out to Emergency department) for immediate evaluation. Dr. Newman fails to realize that the standard of care in skilled nursing facilities, correctional facilities, and residential facilities that are clinically overseen by medical providers have other medical staff such as nurses that assess a patient and report these findings to a physician. As the Chief Medical Officer for the San Diego Sheriff's Department overseeing a daily census of 5,800 inmates, correctional health standards and infrastructure are quite different than that expected for a patient in the community. The standard of care is for medical staff such as nurses to obtain information about a patient's complaints and symptoms and follow protocols guided by policies and procedures and elevate concerning findings to a higher medical authority such as a physician assistant, nurse practitioner, or physician. The standards for inmate medical care deal with access to medical staff and services which Mr. Russell was afforded to by multiple registered nurses and his clinical condition was presented to Dr. Thomas Le who made a clinical determination based on his prior history and current symptoms. Dr. Newman, a cardiologist, has no experience working inside a correctional health facility and his opinions are based on a patient in the community. The Orange County Jail system houses over 6,000 inmates a day. Detention facilities

3

such as Orange County Jail develop clinical infrastructure to address and treat a wide variety of inmate complaints and symptoms. If every adult individual who complained of chest pain had to be sent out to the Emergency department or seen face to face by a physician, then all correctional facilities and other facilities such as skilled nursing facilities would not be able to operate. Dr. Newman again does not understand correctional healthcare standards and does not make opinions based on the existing and validated clinical infrastructure that exists inside a jail setting. Also Dr. Newman's opinion that "immediate evaluation at an emergency room is not necessary for all complaints and symptoms but it is for chest pain" again shows the limitation of his evaluation of the case. Each specialist such as a neurosurgeon, urologist, general surgeon, etc., will have certain diagnosis that are life threatening that could present as symptoms such a headache, abdominal pain, flank pain, etc. As a result it is important to create a medical infrastructure to address medical symptoms and complaints and elevate it to a higher level provider as clinically indicated. Thus his opinions those Orange County jail personnel were below the standard of care falls short because he does not address outside of sending Mr. Russell to the Emergency department, what the deviation was in standard of care based on the environment. Correctional Health standards for Jails and Prisons are governed by Title 15 regulations in California. I have served as a subject matter expert for the Medical/Mental Health Workgroup for Board of State and Community Corrections (BSCC) in 2016 to make the most recent revisions to Title 15 regulations, which govern jail correctional entities in the State of California. There are also published national standards those entities such as National Commission on Correctional Health Care (NCCHC). I am a Certified Correctional Health Professional (CCHP) and also have been certified as a CCHP-Physician. For both Title 15 and NCCHC, the policies and procedures as well as the care provided by the Orange County Medical personnel met the standard of care.

2. "This substandard performance by the medical personnel at the Orange County Jail on January 23 and 24, 2016 resulted in his death.

The medical personnel at the Orange County Jail did not create conditions or cause Mr. Russell to have an aortic dissection. Based on his age and relative lack of risk factors, this could have been spontaneous or a congenital condition. As Dr. Newman's report stated, aortic dissection is a rare diagnosis. The literature shows those who experience an aortic dissection have a mortality rate of 20%. As Dr. Newman also stated in his report, the procedure is not without risks. While it is unfortunate, Mr. Russell had a rare diagnosis of ascending aortic dissection, there is no evidence that he was not assessed multiple times by registered nurses and his entire clinical history was provided to Dr. Le. Dr. Newman also assumes that the Emergency physician would order a CT scan of Mr. Russell's chest to make the diagnosis. Aortic dissection can be missed during an emergency room visit. With Mr. Russell being 30 years old with no risk factors for pulmonary embolus and history of anxiety and chest wall tenderness, the Emergency room physician could have elected not to do a CT scan after obtaining a normal EKG, lab results including negative cardiac markers and a chest x-ray.

3. "The individual whose breach of standard of care was greatest was Dr. Thomas Le, the only physician involved in the patient's care at the jail during his terminal episode.

4

Dr. Thomas Le used the available clinical information about Mr. Russell to make a clinical decision. Additionally in Dr. Newman's report, he states Mr. Russell experienced chest pain for the first time with the episode on January 23 and 24. Based on Mr. Russell's medical history, he had suffered from chest pain which was associated with his anxiety and panic attack in the past. While the diagnosis was wrong, there is no evidence that there was a breach in standard of care. To make that statement, would equate to stating that every physician who does not correctly diagnosis a patient is breaching standard of care. If Dr. Newman equates 100% clinical diagnostic accuracy with standard of care, I don't believe there is any physician or medical provider who would agree with that statement. Mr. Russell was a 30 year old male with only reported high blood pressure. He was a Kaiser patient and no previous workup at Kaiser revealed Mr. Russell to suffer from any cardiac condition. Moreover, Mr. Russell did have a history of anxiety which had caused chest pain in the past. Thus based on the nursing assessment, vital signs, and prior history and current symptoms, it would be reasonable for a medical provider such as Dr. Le to conclude that Mr. Russell was either having an anxiety attack or musculoskeletal chest pain due to recent physical exertion and chest wall tenderness on palpation.

4.   "The performances of Nurses Teofilo and Lumitap were below the standard of care, though not as great an extent as Dr. Le."

While Dr. Newman states he does not claim expertise in nursing standard of care, his opinion is solely based on the nursing staff not sending Mr. Russell to the Emergency department or talking with Dr. Le a second time. Again, Dr. Newman's opinions are based on anecdotal evidence of his personal experience with nurses in a non-correctional setting.

5.   "If the medical personnel at the Orange County Jail, particularly Dr. Le, had performed within the standard of care, I can attest, to a reasonable degree of medical certainty, that Mr. Russell would have survived and done well from the standpoint of his aortic dissection."

Mr. Russell suffered from an ascending aortic dissection that ultimately caused his death. Dr. Newman's statement is misleading because it assumes that if Mr. Russell was either seen in person by Dr. Le or sent out to the Emergency room, the diagnosis of aortic dissection would have been made and that the procedure to repair that aortic dissection carries no mortality risk. The diagnosis of ascending aortic dissection carries a significant mortality risk in the literature and the diagnosis in an Emergency room is based on individual physician assessment. Based on Mr. Russell's symptoms, clinical history, risk factors, and physical exam, an Emergency room physician could elect not to expose Mr. Russell to the radiation from a CT chest when other explanations would be more readily apparent. Dr. Newman also bases his opinions on Mr. Russell going to Hoag hospital system with which he practices at. Based on the location of the facility, Mr. Russell would have gone to Orange County Global Medical Center, a private hospital chain not affiliated with Hoag hospital. Thus Dr. Newman is basing his opinions on the expected treatment course of another hospital's cardiology department and emergency room. I am a board certified emergency department physician who still actively practices at the Veterans Affairs Medical Center Emergency Department in

5

San Diego and can opine on the practices of the Emergency department. I have previously practiced at both a community and academic emergency department and can state that aortic dissection is not a routine diagnosis and that in a number of instances, emergency department providers may fail to make the diagnosis on the initial Emergency department visit for those with atypical symptoms and age group. It is also not uncommon for patients who are diagnosed with aortic dissection by CT scan of their chest by the Emergency department physician to wait an additional 10-12 hours to get to the operating room for operative repair. There are a number of specialists that need to coordinate for surgery including a cardiothoracic surgeon (for repair), anesthesiologist (for general anesthesia), internal medicine (preoperative clearance) to provide the best chance of recovery from a significant surgery. Thus Dr. Newman glosses over the many steps that need to happen after a person is sent to the Emergency department to make the diagnosis of aortic dissection, operative repair, and recovery all of which carry significant risk.

My opinions in this case are based on my experience in the correctional health field and clinical arenas, and upon the documentation provided to me for review. All my opinions in this report are given with a reasonable degree of medical certainty. I reserve the right to change this opinion in the event additional documentation is provided in this matter. Please refer to Dr. Alfred Joshua Expert Report dated January 5, 2018 for additional opinions and background for basis of this rebuttal report.

Executed on January 26, 2018 in San Diego, California

Alfred Joshua, MD, MBA, CCHP-P, FAAEM

6