1
2
3
4
5
6
7
8
9

10          UNITED STATES DISTRICT COURT

11          CENTRAL DISTRICT OF CALIFORNIA

12

13  PATRICK RUSSELL, as Personal            CASE NO. 8:17-cv-00125-JLS-DFM
    Representative of the Estate of Patrick John
14  Russell and individually; LYNNE         **ORDER (1) GRANTING IN PART AND
    RUSSELL, as Personal Representative of  DENYING IN PART DEFENDANTS'
15  the Estate of Patrick John Russell and  MOTION FOR SUMMARY JUDGMENT;
16  individually,                           (2) GRANTING IN PART AND DENYING
                                            IN PART DEFENDANTS' MOTION TO
17             Plaintiffs,                   TRIFURCATE (Docs. 34, 35)**

18      vs.

19

20  COUNTY OF ORANGE; ORANGE
    COUNTY SHERIFF-CORONER SANDRA
21  HUTCHENS, individually and in her
    official capacity; JOSELYN LUMITAP,
22  individually; PATTI TROUT, individually;
    MARIA TEOFILO, individually; THOMAS
23  LE, individually, and DOES 1 through 10,
24  inclusive,
25             Defendants.

26

27

28

I.      **INTRODUCTION**

Before the Court are two Motions filed by Defendants County of Orange (the "County"); Orange County Sheriff Sandra Hutchens individually and in her official capacity; and Jocelyn Lumitap, Patti Trout, Maria Teofilo, and Thomas Le, individually (the "Medical Defendants").  The first is a Motion for Summary Judgment, (MSJ, Doc. 34), and the second is a Motion to Trifurcate, (MTT, Doc. 35).  Plaintiffs Lynne and Patrick Russell opposed both Motions. (MSJ Opp., Doc. 41; MTT Opp., Doc. 40.)  Defendants replied. (MSJ Reply, Doc. 43; MTT Reply, Doc. 44.)  After reviewing the papers and holding oral argument, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.  The Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Trifurcate.

.

II.     **BACKGROUND**

      A.  **Factual Background**

On January 8, 2016, Decedent Patrick John Russell ("Russell") was taken to the Orange County Jail to be booked for a probation violation.  (Genuine Disputes ("Gen. Disp.") ¶¶ 1–2, Doc. 42.)  Upon his arrival to the Orange County Jail Intake Release Center, he reported that he had no chronic conditions, medical health problems, or mental health problems and that he was not taking any medications.  (*Id.* ¶ 5.)

On January 23, 2016, at approximately 10:35 p.m., Russell was taken to the medical ward after experiencing symptoms of nausea, vomiting, and hyperventilation.  (Teofilo Notes at 76, Ex. A to Teofilo Decl., Doc. 34-2.)  Russell was treated by Nurse Maria Teofilo.  (Teofilo Decl. ¶ 3, Doc. 34-2.)  Russell reported to Nurse Teofilo that he was unable to breathe and that he was "having an anxiety attack."  (*Id.*)  Nurse Teofilo took Russell's vital signs and gave him bismuth subsalicylate to treat his gastrointestinal symptoms.  (*Id.*)  She then sent him back to jail.

1

1      A few hours later, at approximately 12:03 a.m. on January 24, 2016, Russell

2  returned to the medical ward, complaining of chest pain.  (*Id.* ¶ 4.)  Russell indicated to

3  Nurse Teofilo that the pain could be "muscular in nature" as a result of the thirty push-ups

4  he had done the day before.  (*Id.*)  Russell also stated that he was "nervous, anxious, and

5  unable to calm down."  (*Id.*)  Nurse Teofilo noted that he was "unable to express [his]

6  needs clearly."  (Teofilo Notes at 82.)  She suggested that Russell stretch to relieve his

7  chest pain and referred him to the Intake Release Center for a mental health evaluation.

8  (Teofilo Decl. ¶ 4.)

9      Roughly one hour later, at 1:08 a.m., Russell returned to the medical ward and was

10  treated by Nurse Patricia Trout.  (Gen. Disp. ¶ 13.)  Russell reported to Nurse Trout that he

11  was experiencing chest pain, pain radiating to his arm and jaw, continued vomiting,

12  nausea, and shortness of breath.  (Trout Notes at 81, Ex. B to Trout Decl., Doc. 34-3.)

13  Russell also stated that his hands and feet were numb.  (*Id.*)  In response to Russell's

14  symptoms, Nurse Trout administered nitroglycerin.  (Trout Decl. ¶ 2, Doc. 34-3.)  Five

15  minutes after receiving the nitroglycerin, Russell continued to experience severe chest pain

16  and vomited again.  (Trout Notes at 81.)  Nurse Trout further observed that his heart rate

17  and respiration were elevated.  (*Id.*)  In her notes, Nurse Trout wrote that she notified Dr.

18  Le of "the above," apparently referring to Russell's severe pain following administration

19  of nitroglycerin, continued vomiting, and elevated heart and respiration rates.  (*See* Trout

20  Notes at 81.)  In Dr. Le's declaration, he states that Nurse Trout "reported to me all of the

21  symptoms Russell had been experiencing (complaints of anxiety and muscle pain from

22  doing sit-ups)."  (*See* Le Decl. ¶ 2, Doc. 34-4.)  Dr. Le then ordered that Russell be given

23  Motrin and receive a mental health evaluation.  (Trout Notes at 81.)

24      Russell thereafter received his mental health evaluation, during which he was

25  advised on breathing and relaxation exercises to calm his anxiety.  (Sierra Notes at 58–62,

26  Ex. E to Lin Decl., Doc. 34-7.)  Russell was then sent back to jail.

27

28

At 2:04 a.m., Russell returned to see Nurse Teofilo in the medical ward complaining of "flu-like" symptoms.  (Teofilo Decl. ¶ 5, Doc. 34-2.)  Nurse Teofilo sent Russell back to jail, instructing him to return to the medical ward if he felt he needed further evaluation.  (*Id.*)  Around 5:32 a.m., Russell returned to the medical ward.  (*Id.* ¶ 6.)  He stated to Nurse Teofilo, "I need help[.]  [M]y chest really bothers me." (Teofilo Notes at 80.)  He reported feeling pain located around his throat and chest at a level of ten on a ten-point scale, and Nurse Teofilo observed that he was hyperventilating.  (*Id.*)  She also wrote in her notes that he had been treated with nitroglycerin by Nurse Trout but that it did not help with his chest pain.  (*Id.*)  Nurse Teofilo took Russell's vital signs, which reflected an elevated heart rate of 101, elevated blood pressure of 142/98, and a respiration rate of 24.  (*Id*.)  She allowed him to remain in the medical ward for continued observation. (Teofilo Decl. ¶ 6.)

Around 7:00 a.m., Nurse Jocelyn Lumitap evaluated Russell.  (Lumitap Decl. ¶ 2, Doc. 34-5.)  She took his vital signs and then determined through physical examination that his chest pain was "muscular."  (*Id.*)  Nurse Lumitap noted that Russell was sitting with his head down and supporting his chest with his right hand.  (Lumitap Notes at 80, Ex. C to Lumitap Decl., Doc. 34-5.)  Russell reported to Nurse Lumitap that he was "worried about his physical pain and want[ed] to see the [doctor]."  (*Id.*)  Nurse Lumitap administered Motrin and provided Russell with an analgesic balm for his chest pain.  (*Id.*) She assured him she would check on him again after lunch.[1]

---

[1] As an exhibit to their Opposition, Plaintiffs submitted photographs of text messages that were purportedly sent around 9:30 a.m. on January 24, 2016, discussing Russell's condition.  (*See* Gen. Disp. ¶ 30, referencing Ex. I to Opp., Doc. 41-10.)  However, the declaration accompanying these text messages does not provide sufficient facts to authenticate them.  (*See* Sehat Decl. ¶ 11, Doc. 41-1.)  For example, the declaration does not state how the sender of the messages knew information regarding Russell's condition, what time these messages were sent, to whom they were sent, or whose phone is pictured.  Accordingly, the Court may not consider this evidence. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("[U]nauthenticated documents cannot be considered in a motion for summary judgment.")

Four hours later, at 11:08 a.m., Nurse Lumitap returned to Russell's room.  (*Id.*)
Russell reported "deep throbbing pain in the middle of his chest and throat" at a level of
ten.  (*Id.*)  Russell denied having a heart condition but stated that in the past he had been
told he had high blood pressure.  (*Id.*)  He stated that his chest hurt more when he inhaled
deeply.  (*Id.*)  Nurse Lumitap observed that Russell was restless, hyperventilating, and
breathing shallowly.  (*Id.*)

At 11:40 a.m., Russell vomited again and continued to experience nausea, so he laid
down on the floor.  (*Id.*)  Nurse Lumitap re-examined his vitals; his blood pressure was
135/96 and his pulse was still elevated at 105.  (*Id.*)  She noted that he was
hyperventilating "on and off" and "moans and groans intermittently."  (*Id.*)  Nurse
Lumitap then left Russell's room.

At 12:20 p.m., Nurse Lumitap returned to Russell's room and found him
unresponsive.  (Lumitap Decl. ¶ 6.)  She notified deputies of a "man down," and to call
911.  (*Id.*)  A deputy arrived and began CPR.  (*Id.*)  Paramedics arrived on the scene at
12:28 p.m., and Russell was transported to Hoag Hospital at 12:43 p.m. where he later
died.  (Gen. Disp. ¶ 42.)

At 3:39 p.m., Nurse Lumitap made an entry in Russell's medical notes, which stated
that she consulted with an on-call nurse practitioner at 10:43 a.m. regarding Russell's
symptoms, and the nurse practitioner instructed her to continue to administer Motrin as
prescribed by Dr. Le.  (Lumitap Decl. ¶ 2; Lumitap Notes at 79.)

The Orange County Coroner determined that Russell died of a "hemothorax and
hemopericardium" due to a "ruptured aortic dissection" and "hypertensive heart disease."
(Coroner's Report, Ex. F to Lin Decl., Doc. 34-7.)  Plaintiffs retained a private pathologist
who came to the same conclusion.  (*See* Pathologist's Report at 6–7, Ex. J to Opp., Doc.
41-11.)

B. **Procedural History & Discovery**

4

On January 24, 2017, Plaintiffs filed the instant action against Defendants. (Compl., Doc. 1.)  On March 31, 2017, Plaintiffs filed their First Amended Complaint, alleging claims for (1) deliberate indifference to a substantial risk of harm to health in violation of 42 U.S.C. § 1983 ("section 1983"), against Orange County Sherriff Sandra Hutchens and the Medical Defendants; (2) failure to train in violation of section 1983, against the County; (3) unconstitutional custom, practice, or policy in violation of section 1983, against the County; (4) wrongful death, against all Defendants; (5) survival, against all Defendants; (6) medical negligence against the County and the Medical Defendants; and (7) failure to summon medical care in violation of Cal. Gov't Code § 845.6., against all Defendants.  (FAC ¶¶ 50–94.)

The parties have since conducted discovery, during which Plaintiffs obtained evidence of the Orange County Health Care Agency (OCHA)'s policies and procedures for registered nurses who provide care to incarcerated patients.  According to the OCHA, the symptoms that Russell was displaying prior to his death are consistent with the symptoms of acute angina, a serious heart condition that may precede cardiac arrest.  (*See* OCHA Policy on Angina, OCHA Policy on Cardiac Arrest; Exs. K, L to MSJ Opp.; Docs. 37-1, 37-2.)  Symptoms of angina include: pain radiating to the jaws, back, shoulders, arms, and fingers; shortness of breath; dyspnea (difficulty breathing); diaphoresis (shallow breathing); and elevated pulse or blood pressure.  (OCHA Policy on Angina at 472.)  When these symptoms are present, nurses are instructed to administer nitroglycerin and to consult with a physician as soon as possible.  (*Id.* at 472–73.)  If symptoms do not subside after the first dose of nitroglycerin, nurses are instructed to call paramedics to transfer the patient to the hospital.  (*Id.* at 473.)

Plaintiffs also deposed Nurses Trout and Teofilo regarding the OCHA's policy. When questioned as to why she did not hospitalize Russell following the ineffective dose of nitroglycerin, Nurse Trout testified that she "ponder[ed]" calling the paramedics but instead notified Dr. Le and ended her investigation once Dr. Le recommended Motrin and

1  a mental health evaluation.  (Trout Dep. at 108–09, Ex. F to MSJ Opp., Doc. 41-7.)  Nurse

2  Teofilo was also questioned regarding her decision not to hospitalize Russell after she

3  learned that the nitroglycerin was ineffective.  (Teofilo Dep. at 73, Ex. E to MSJ Opp.,

4  Doc. 41-6.)  She acknowledged that she was aware of the OCHA policy to hospitalize

5  under those circumstances and that she had been trained according to that policy, but she

6  said that she had conversed with Nurse Trout and had likewise satisfied herself with Dr.

7  Le's recommendation.  (*Id.*)

8        Defendants now move for summary judgment on all seven of Plaintiffs' claims.

9  (*See* MSJ.)  Separately, they move to divide the trial into four phases, as follows: the first

10  phase trying Plaintiffs' liability claims against the Medical Defendants; the second phase

11  trying Plaintiffs' *Monell* claims against the County; the third phase trying Plaintiffs'

12  demand for compensatory damages; and the fourth phase trying Plaintiffs' demand for

13  punitive damages.  (MTT.)

14

15  **III.    MOTION FOR SUMMARY JUDGMENT**

16        **A. Legal Standard**

17        In deciding a motion for summary judgment, the Court must view the evidence in

18  the light most favorable to the non-moving party and draw all justifiable inferences in that

19  party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary

20  judgment is proper "if the [moving party] shows that there is no genuine dispute as to any

21  material fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R.

22  Civ. P. 56.  A factual dispute is "genuine" when there is sufficient evidence such that a

23  reasonable trier of fact could resolve the issue in the non-movant's favor, and a fact is

24  "material" when it might affect the outcome of the suit under the governing law. *Anderson*,

25  477 U.S. at 248.  But "credibility determinations, the weighing of evidence, and the

26  drawing of legitimate inferences from the facts are jury functions, not those of a judge."

27

28

1  *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v.*

2  *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

3      The role of the Court is not to resolve disputes of fact but to assess whether there

4  are any factual disputes to be tried.  The moving party bears the initial burden of

5  demonstrating the absence of a genuine dispute of fact.  *Celotex Corp. v. Catrett*, 477 U.S.

6  317, 323 (1986).  "Once the moving party carries its initial burden, the adverse party 'may

7  not rest upon the mere allegations or denials of the adverse party's pleading,' but must

8  provide affidavits or other sources of evidence that 'set forth specific facts showing that

9  there is a genuine issue for trial.'"  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

10 2001) (quoting Fed. R. Civ. P. 56(e)).

11

12      **B.  <u>Section 1983 Claims</u>**

13          **1.  The Medical Defendants**

14      Plaintiffs' first cause of action is brought against the Medical Defendants under

15 section 1983 for "deliberate indifference to a substantial risk of harm" in violation of the

16 Fourteenth Amendment.  (*See* FAC ¶¶ 50–65.)  Section 1983 permits citizens to bring civil

17 actions against public employees who have violated their constitutional rights.  *See Baker*

18 *v. McCollan*, 443 U.S. 137, 146 (1979).  However, the qualified immunity doctrine limits

19 such actions to those where the constitutional right was clearly established at the time of

20 the violation.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Defendants argue that the

21 Medical Defendants are entitled to qualified immunity because they did not violate

22 Russell's constitutional rights and, even if they did, the right that they violated was not

23 "clearly established" at the time of Russell's death.  (MSJ Mem. at 9–16, Doc. 34.)

24          **a.  Deliberate Indifference**

25      "[C]laims for violations of the right to adequate medical care brought by pretrial

26 detainees against individual defendants under the Fourteenth Amendment must be

27 evaluated under an objective deliberate indifference standard."  *Gordon v. Cty. of Orange*,

28

888 F.3d 1118, 1124–25 (9th Cir. 2018).  "Based thereon, the elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries."  *Id.* at 1125.  "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case."  *Id.*  Ultimately, "the plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard."  *Id.*

The sole element of Plaintiffs' claim that Defendants dispute is the third – whether the Medical Defendants acted with deliberate indifference to Russell's condition.  "A determination of 'deliberate indifference' involves an examination of two elements: [1] the seriousness of the prisoner's medical need and [2] the nature of the defendant's response to that need."  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

As to the first element, a serious medical need exists if "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *Id.*  Clearly, Russell's medical need was qualitatively serious and posed a "substantial" risk to his health, as it resulted in his death.  *See id.*  Moreover, Russell's symptoms – nausea, vomiting, severe pain radiating through his chest and throat, hyperventilation, numbness in his extremities – were all consistent with the likelihood that Russell was experiencing a life-threatening cardiac event.  (*See* OCHA Policies on Angina,

1   Cardiac Arrest.)  A reasonable doctor would find these symptoms and their attendant cause
2   "worthy of comment or treatment."  *See McGuckin*, 974 F.2d at 1059–60.

3       As to the second element, the Court considers the evidence that the Medical
4   Defendants "fail[ed] to act in the face of an unjustifiably high risk of harm that is either
5   known or so obvious that it should be known."  *Farmer v. Brennan*, 511 U.S. 825, 837
6   (1994) (defining civil law's "objective recklessness" standard).

7       As an initial matter, the course of treatment chosen by the Medical Defendants was
8   clearly "medically unacceptable under the circumstances."  *Colwell v. Bannister*, 763 F.3d
9   1060, 1068 (9th Cir. 2014).  Stretching tips, analgesic balm, and Motrin are inappropriate
10  to treat a serious cardiac condition.  (*See* Telofilo Decl. ¶ 4; Trout Notes at 81; Lumitap
11  Notes at 80.)  Although Nurse Trout eventually administered nitroglycerin, which,
12  according to the OCHA's policy, is a medically appropriate *initial* response to the
13  symptoms that Russell was displaying, Defendants failed to follow through with
14  appropriate treatment when it became clear that this initial treatment was insufficient.  (*See*
15  Trout Notes at 81.)  Defendants' chosen course of "treatment" is not merely a "difference
16  of opinion between a physician and the prisoner," *see Colwell*, 763 F.3d at 1068, but
17  rather, is a "patently unreasonable" response to Russell's symptoms.[2]  *Self v. Crum*, 439
18  F.3d 1227, 1232 (9th Cir. 2006).  (*See* OCHA Policy on Angina; Teofilo Dep. at 73.)  *Cf.*
19  *West v. Bennett*, No. CV06–51–S–LMB, 2009 WL 2462397 (D. Idaho Aug. 10, 2009)
20  (finding no deliberate indifference where, in response to complaints of chest pain, the
21  plaintiff was sent to the emergency room even though "all signs pointed to a muscle spasm
22  rather than a heart attack").

---

26      [2] To the extent that Defendants argue that summary judgment is appropriate simply because
    Russell received *some* treatment, (Reply at 5), this argument is incorrect as a matter of law: a
27  plaintiff "need not prove complete failure to treat [the patient] …[;] access to medical staff is
    meaningless unless that staff is competent and can render competent care."  *See Ortiz v. City of*
28  *Imperial*, 884 F.2d 1312, 1313–14 (9th Cir. 1989).

1    Thus, the Court turns to the evidence that the risk of harm to Russell was either
2    "known or so obvious that it should [have been] known" to the Medical Defendants.
3    *Farmer*, 511 U.S. at 837.

4    Nurse Teofilo was the first medical professional to treat Russell.  She was aware as
5    early as 10:35 p.m. on January 23, 2016, that Russell was experiencing medically
6    concerning symptoms, *i.e.*, nausea, vomiting, and hyperventilation.  (Teofilo Notes at 75–
7    76.)  Within two hours, Russell returned to Nurse Teofilo; his symptoms had escalated to
8    include chest pain and an "[inability] to express his needs clearly."  (Teofilo Notes at 82.)
9    Although Russell did mention that he had done push-ups the day before, Nurse Teofilo
10   personally observed over the next seven hours that Russell's pain was increasing and his
11   overall condition was deteriorating.  (*See generally*, Teofilo Decl.; Teofilo Notes at 80–
12   82.)  By 5:30 a.m., Russell was begging, "I need help[.]  [M]y chest really bothers me."
13   (Teofilo Notes at 80.)  Moreover, by that point in the morning, Nurse Teofilo knew that
14   Nurse Trout had administered nitroglycerin to Russell and that the treatment had been
15   ineffective.  As Nurse Teofilo admitted in her deposition, she also was aware that
16   hospitalization was the appropriate treatment for a patient whose symptoms had not
17   responded to nitroglycerin.  (Teofilo Dep. at 73.)  Thus, the evidence is more than
18   sufficient to indicate that Nurse Teofilo knew or should have known that Russell was
19   experiencing serious and persistent symptoms of cardiac distress, and she yet elected
20   neither to hospitalize him nor even to consult an on-call physician.  *See Farmer*, 511 U.S.
21   at 837.

22   Nurse Trout was the second medical professional to treat Russell.  Russell reported
23   to Nurse Trout that he was experiencing chest pain, pain radiating to his arm and jaw,
24   continued vomiting, nausea, shortness of breath, and numbness in his hands and feet.
25   (Trout Notes at 81.)  In response, Nurse Trout administered nitroglycerin to Russell, a fact
26   which alone indicates that Nurse Trout actually *knew* that Russell's symptoms were
27   qualitatively serious.  *Farmer*, 511 U.S. at 837.  Thereafter, Nurse Trout observed that this

28

1    treatment did not relieve Russell's pain and that his heart rate and respiration remained

2    elevated.  (Trout Notes at 81.)  Nevertheless, despite her knowledge and training, Nurse

3    Trout opted to call Dr. Le and proceed with a course of treatment of Motrin instead of

4    hospitalizing Russell.  (Trout Dep. at 108–09.)

5         Nurse Lumitap was the last of the Medical Defendants to treat Russell while he was

6    alive, and she observed his condition for a period of more than five hours, from 7:00 a.m.

7    until he became unresponsive at approximately 12:20 p.m.  (Lumitap Decl. ¶¶ 2, 6.)

8    Although Nurse Lumitap claimed to have determined that Russell's chest pain was

9    muscular in her initial evaluation, she wrote in her notes that he was sitting slumped in a

10   chair clutching his chest and that he was "worried about his physical pain and want[ed] to

11   see the [doctor]."  (Lumitap Notes at 80.)  Even to a lay person, this description is not

12   consistent with a person experiencing muscle soreness from 30 push-ups, especially given

13   that Russell's records by this point reflected that he had experienced unrelenting vomiting

14   and chest pain for more than nine hours, despite the administration of nitroglycerin.

15   (Lumitap Notes at 79–80.)  Nevertheless, Nurse Lumitap left Russell by himself for four

16   hours; when she checked on him at 11:08 a.m., his symptoms had not relented.  He was

17   still experiencing severe chest pain, his heart rate was elevated, and he continued to

18   hyperventilate.  (Lumitap Notes at 79.)  Still, she left him alone for another hour, and by

19   the time she returned, Russell was unresponsive.  (Lumitap Decl. ¶ 6.)

20        Finally, Dr. Le did not personally observe Russell's symptoms, but his declaration

21   states that Nurse Trout had alerted him to "all of the symptoms Russell had been

22   experiencing."  (Le Decl. ¶ 2.)  Dr. Le's declaration goes on to specifically identify

23   Russell's "anxiety and muscle pain" as the particular symptoms to which he was alerted,

24   but Nurse Trout's notes tell a different story about Dr. Le's knowledge.  (*See* Trout Notes

25   at 81.)  According to Nurse Trout's notes, she notified Dr. Le that five minutes after

26   administering nitroglycerin, Russell reported severe chest pain, vomited, continued to have

27   an elevated heart rate, and continued to breathe rapidly.  (*Id.*, stating "Notified Dr. T. Le of

28

11

above.")  Resolving this factual dispute in favor of Plaintiffs, the evidence indicates that Dr. Le was made aware of all of Russell's symptoms as described by Nurse Trout's notes. Thus, without examination, Dr. Le ordered Motrin and a mental health evaluation, both of which are clearly inappropriate to treat the totality of the symptoms Russell was experiencing.  (*Id.*)  This course of conduct, including Dr. Le's failure to examine Russell in the face of objectively serious symptoms, is sufficient to raise a triable issue of fact that Dr. Le acted with deliberate indifference.  *See Ortiz v. City of Imperial*, 884 F.2d 1312, 1313–14 (9th Cir. 1989) (finding a triable issue as to the deliberate indifference of a doctor who, after being alerted to symptoms of a serious head injury, "without an examination," prescribed medication that was "inappropriate to treat a head injury").

Based on the foregoing evidence, the Court concludes that the Medical Defendants are not entitled to summary judgment on the issue of deliberate indifference.  Given the apparent seriousness of Russell's medical needs, their awareness of his symptoms, and their "repeated fail[ures] to treat [him] properly" over the course of fourteen hours, the evidence is susceptible to the interpretation that the Medical Defendants acted with deliberate indifference.  *See McGuckin*, 974 F.2d at 1060 (noting that evidence of either an especially serious medical condition or repeated failures to treat an inmate properly "strongly suggest that the defendant's actions were motivated by 'deliberate indifference'").  *See also Ortiz*, 884 F.2d at 1313–14.  Thus, it is for the jury to decide whether the Medical Defendants' actions amounted to deliberate indifference to Russell's serious medical needs.

### b.  Qualified Immunity

"Government officials who perform discretionary functions are protected from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Lum v. Jensen*, 876 F.2d 1385, 1386 (9th Cir. 1989).

12

The Court finds that, at the time of Russell's death, a reasonable person would have been aware of the law regarding the medical treatment of prisoners:  "The government is required to provide medical care for those whom it punishes by incarceration, and prison officials who act with 'deliberate indifference' to an inmate's serious medical needs violate the Eighth Amendment."  *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992), *overruled in part on other grounds as recognized in Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012).  *See also Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

"[A] finding of deliberate indifference necessarily precludes a finding of qualified immunity."  *Hamilton*, 981 F.2d at 1066.  Although resolution of the factual issues at trial "may well relieve [the Medical Defendants] of any liability in this case, if the [Plaintiffs'] version of the facts were to prevail at trial, a jury might conclude that the [Medical Defendants] were deliberately indifferent."  *Clement*, 298 F.3d at 906.  "Under such circumstances, [their] actions are not protected by qualified immunity."  *Id.  See also Williams v. Ross*, No. C 04-2409 SI, 2009 WL 890399, at *2 (N.D. Cal. Apr. 1, 2009) (finding that prior cases have "clearly establish[ed] a prisoner's recognized right to prompt medical care when displaying symptoms of cardiac arrest").

Accordingly, the Medical Defendants are not entitled to the qualified immunity defense.  Summary judgment is DENIED as to the Medical Defendants for Plaintiffs' first cause of action, deliberate indifference to a substantial risk of harm to health in violation of section 1983.

### 2.  Sheriff Hutchens

Plaintiffs' deliberate indifference claim is also brought against Sheriff Hutchens. (FAC ¶¶ 50–65.)  Defendants argue that summary judgment should be granted as to Sheriff Hutchens because there is no evidence that she knew of or participated in Russell's treatment.  (MSJ Mem. at 14.)

13

1    The Court agrees.  In a section 1983 action, unless a state law provides otherwise, a

2  state official cannot be liable merely because she is a supervisor; rather, she must "play a

3  personal role in the constitutional deprivation."  *See Redman v. Cnty. of San Diego*, 942

4  F.2d 1435, 1446 (9th Cir. 1991), *abrogated on other grounds as recognized by Davis v.*

5  *Folsom Cordova Unified Sch. Dist.*, 674 F. App'x 715, 717 (9th Cir. 2017).  Plaintiffs have

6  introduced no evidence that Hutchens knew of, participated in, or directed the

7  constitutional violation against Russell.  Therefore, Sherriff Hutchens bears no personal

8  liability for the actions of the Medical Defendants and summary judgment is GRANTED

9  as to Defendant Hutchens for Plaintiffs' deliberate indifference claim.

10

11         **3.  *Monell* Claims**

12    Plaintiffs' second and third causes of action are brought against the County under

13  section 1983 for failure to properly train medical professionals and for maintaining an

14  unconstitutional custom, practice, or policy.   (FAC ¶¶ 66–78.)

15    Section 1983 claims brought against a governmental entity under a theory of

16  *respondeat superior* are known as *Monell* claims.  *See Thompson v. City of Los Angeles*,

17  885 F.2d 1439, 1443 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cty. of*

18  *San Francisco*, 595 F.3d 964 (9th Cir. 2010).  A plaintiff may prevail on his *Monell* claims

19  only if he "establishes that his injuries were inflicted pursuant to an official county policy

20  or custom."  *Thompson*, 885 F.2d at 1443.

21    Plaintiffs have not provided evidence of any unconstitutional County custom or

22  policy.  In fact, in their briefing, they do not even attempt to address Defendants' *Monell*

23  arguments; therefore, the Court infers that Plaintiffs have abandoned these claims.  *See*

24  *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) ("Plaintiff abandoned

25  her other two claims by not raising them in opposition to the County's motion for

26  summary judgment.)

27

28

1    Accordingly, summary judgment is GRANTED as to Plaintiffs' second cause of
2    action, failure to train; and Plaintiffs' third cause of action, maintenance of an
3    unconstitutional custom, practice, or policy.

4

5    **C.    State Law Claims**

6    Plaintiffs' fourth through eighth causes of action are brought under California state
7    law for wrongful death; survival; medical negligence; and failure to summon medical care.
8    (FAC ¶¶ 79–94.)  Defendants argue that summary judgment should be granted as to all
9    state law claims on the basis of statutory immunity.

10

11    **1.  Wrongful Death, Survival, and Medical Negligence Claims**

12    Plaintiffs' fourth, fifth, and sixth causes of action are for wrongful death, survival,
13    and medical negligence, respectively, based on the acts of the Medical Defendants in
14    failing to diagnose and treat Russell.  (FAC ¶¶ 79–86.)

15    Under § 844.6 of the Cal. Gov't Code, public entities are immune from liability for
16    injuries to prisoners.  Cal. Gov't Code § 844.6(a)(2).  This immunity extends to actions for
17    wrongful death brought on behalf of the deceased prisoner.  *See May v. Monterey Cnty.*,
18    139 Cal. App. 3d 717 (1983); *Lowman v. Cnty. of L.A.*, 127 Cal. App. 3d 613 (Ct. App.
19    1982).  Thus, summary judgment is GRANTED as to the County and Sheriff Hutchens
20    with respect to Plaintiffs' fourth cause of action, wrongful death; fifth cause of action,
21    survival; and sixth cause of action, medical negligence.

22    However, public employees sued in their individual capacity, as the Medical
23    Defendants here, "are statutorily liable to the same extent as private persons for injuries
24    caused by their acts or omissions" unless a statute provides otherwise.  *Cotta v. Cty. of
25    Kings*, 79 F. Supp. 3d 1148, 1182 (E.D. Cal. 2015) (*citing Hayes v. Cty. of San Diego*, 305
26    P.3d 252 (2013)), *on reconsideration in part*, No. 1:13-CV-359-LJO-SMS, 2015 WL
27    521358 (E.D. Cal. Feb. 9, 2015), *aff'd in part, rev'd in part*, 686 F. App'x 467 (9th Cir.

28

2017).  Defendants do not cite to any statutory authority that extends § 844.6 immunity to individual public employees for wrongful death based on medical negligence.  (*See* MSJ Mem. at 20–22.)   Indeed, subsection (d) of § 844.6 states, "Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission."  *See* Cal. Gov't Code § 844.6(d).  Accordingly, summary judgment is DENIED as to the Medical Defendants for Plaintiffs' fourth, fifth, and sixth causes of action.

### 2.  Failure to Summon Medical Care

Plaintiffs' seventh cause of action is for "failure to summon medical care" in violation of Cal. Gov't Code § 845.6.  (FAC ¶¶ 92–94.)  Under § 845.6, a public entity or public employees may be liable when "the employee is acting within the scope of his employment, … [and] knows or has reason to know that the prisoner is in need of immediate medical care and … fails to take reasonable action to summon such medical care."  Cal. Gov't Code § 845.6.  However, § 845.6 applies only to the employee's failure to summon medical care, "not for certain employee's malpractice in providing that care." *Castaneda v. Dept. of Corrections and Rehabilitation*, 151 Cal.Rptr.3d 648, 663 (Ct. App. 2013).  Plaintiffs here allege that the Medical Defendants provided substandard medical care to Russell, not that they failed to summon medical care.

Therefore, summary judgment is GRANTED in favor of all Defendants as to Plaintiffs' seventh cause of action.


### III.   MOTION TO TRIFURCATE

Because the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' *Monell* claims, Defendants' request to bifurcate trial of the liability claims and the *Monell* claims is DENIED AS MOOT.  Therefore, the Court addresses only Defendants' requests to (1) bifurcate the liability phase of the trial from the damages phase

1   and (2) to bifurcate the compensatory damages phase from the punitive damages phase.

2   (MTT.)

3

4   ### A. __Legal Standard__

5       Federal Rule of Civil Procedure 42(b) provides that, "[f]or convenience, to avoid

6   prejudice, or to expedite and economize, the court may order a separate trial of one or

7   more separate issues, claims, crossclaims, counterclaims, or third-party claims."  Fed. R.

8   Civ. P. 42(b).  "The decision to bifurcate is committed to the sound discretion of the trial

9   court."  *Hunter v. City and Cty. of San Francisco*, No. 11-4911 JSC, 2012 WL 4831634, at

10  *10 (N.D. Cal. Oct. 10, 2012) (*citing Hangarter v. Provident Life and Acc. Ins. Co.*, 373

11  F.3d 998, 1021 (9th Cir. 2004)).

12

13  ### B. __Discussion__

14  #### 1. __Bifurcation of Liability and Compensatory Damages Phases__

15      Defendants set forth two arguments in favor of bifurcating the trial into a liability

16  trial and a damages trial.  First, they argue that bifurcation promotes judicial efficiency and

17  economy because it "would potentially eliminate lengthy, tedious medical testimony

18  regarding … Russell's life expectanc[y]."  (MTT Mem. at 10.)   Second, they argue that

19  bifurcation is necessary because "emotionally charged testimony" from Russell's parents,

20  which would be pertinent only to damages, could "unfairly warp [Defendants'] right to a

21  fair trial."  (*Id.*)

22      The Court is not persuaded that bifurcation will promote judicial economy in the

23  instant case, as it is unlikely that damages-related testimony will be lengthy.  *Howard v.*

24  *Cty. of Riverside*, No. ED-CV-12-00700-VAP (OPx), 2014 WL 12589655, at *1 (C.D. Cal.

25  June 3, 2014).  Defendants' second argument, as to the testimony of Russell's parents, is

26  likewise unconvincing.  To the extent that Defendants may face prejudice as a result of this

27  testimony, Defendants have not shown that such prejudice could not be cured through an

28

appropriate limiting instruction.  *See Hamm v. Am. Home Prod. Corp.*, 888 F. Supp. 1037,
1039 (E.D. Cal. 1995).  Accordingly, Defendants' request to bifurcate the liability and
compensatory damages phases of the trial is DENIED.

### 2.  Bifurcation of Compensatory and Punitive Damages Phases

Defendants also request that the Court hold a separate trial on the issue of punitive
damages in the event that the jury finds that punitive damages should be assessed.  (MTT
Mem. at 11.)  Defendants argue that evidence of their net worth, which is relevant to
punitive damages, could be prejudicial to the jury's determination of compensatory
damages.  (*Id.*)  Defendants are correct that evidence of a defendant's financial standing is
inadmissible to the determination of compensatory damages and that such evidence can
often be prejudicial.  *See Geddes v. United Fin. Gp.*, 559 F.2d 557, 560 (9th Cir. 1977);
*999 v. C.I.T. Corp.*, 776 F.2d 866, 872 (9th Cir. 1985).  Accordingly, Defendants' request
for a separate trial on the issue of punitive damages is GRANTED.

1

### IV.   **CONCLUSION**

2      For the foregoing reasons, Defendants' Motion for Summary Judgment is

3 GRANTED as to Plaintiffs' claims against Sherriff Hutchens; Plaintiffs' *Monell* claims

4 against the County; and Plaintiffs' seventh cause of action, failure to summon medical

5 care.  Accordingly, Sherriff Hutchens and the County are DISMISSED.  Defendants'

6 Motion is DENIED as to Plaintiffs' claims for deliberate indifference, wrongful death,

7 survival, and medical negligence against the Medical Defendants.  Finally, the Motion to

8 Trifurcate is GRANTED IN PART and DENIED IN PART.

9      Further, in light of the Court's holding, the parties are ORDERED to file updated

10 versions of their joint proposed final pretrial conference order, proposed jury instructions,

11 and proposed special verdict form no later than June 29, 2018.

12

13

14 Dated:  June 11, 2018

15                               HON. JOSEPHINE L. STATON
                                 UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

19